**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **STEVEN CASH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-2736-STA-dkv** |
| | ) | |
| **SIEGEL-ROBERT, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant's Motion for Summary Judgment (D.E. # 19), filed on February 17, 2012. Plaintiff filed a Response (D.E. # 20) on March 16, 2012, and Defendant filed a Reply (D.E. # 27) on April 20, 2012. For the following reasons, Defendant's Motion is **GRANTED**.

## BACKGROUND

Plaintiff filed his Complaint alleging a violation of the Americans with Disabilities Act ("ADA") on October 15, 2010. (D.E. # 1.) In his Complaint, he asserted that Defendant discriminated against him "by denying him a return to work with or without a reasonable accommodation, and then, by terminating his employment under an inflexible, blanket policy." (Compl., D.E. # 1, ¶ 20.) After Defendant filed its first Answer, Plaintiff filed his Amended Complaint on June 20, 2011. (D.E. # 12.) However, Plaintiff did not add any causes of action, nor did the cause of Defendant's alleged discrimination change. (Am. Compl., D.E. # 12, ¶ 20.)

1

After Defendant filed its Amended Answer (D.E. # 13) on July 5, 2011, the docket reflects little activity until Defendant filed the Motion for Summary Judgment now before the Court.

The following facts are undisputed for purposes of this Motion unless otherwise noted. Plaintiff began working as a full-time employee at Defendant's Ripley, Tennessee, plant in January of 2007. (Pl.'s Resp. to Def.'s Statement of Facts, D.E. # 20-1, at 1.) By January of 2009, Plaintiff worked as a Mold Setter, which required him to work on a three-person team loading two to three molds into presses each day. (*Id.*) The molds weighed between 500 and 32,000 pounds each. (*Id.*) Mold Setters had to stand, lift, stoop, crawl, and climb frequently to do their jobs. (*Id.*)

In early January of 2009, Plaintiff began to suffer from acute back pain. (*Id.* at 2.) At work, he had to take two to three times the dosage of pain medication prescribed by his physician. (*Id.*) Plaintiff disputes this fact because it is "an attempt to demean . . . Plaintiff through summary judgment." (*Id.*) However, Plaintiff cites to the same deposition pages as Defendant. In his deposition, Plaintiff stated that he told his supervisor and Carolyn Howard ("Howard"), one of Defendant's human resources officers and the only individual who made the decision to terminate Plaintiff (Dep. of Howard, D.E. # 20-5, at 4-7),[1] that he was taking two or three times the amount of prescribed pain medication "because none of the pills really affect [him] the way that they normally do others." (Dep. of Pl., D.E. # 19-3, at 11.) Plaintiff's objection stems from the following exchange:

> Q: Well, let me get back to this conversation. I believe Ms. Howard will say that you had a conversation where you indicated you were taking two or three times

---

[1] The Court will cite to the ECF page numbers in lieu of the different deposition page numbers.

the amount of meds and she suggested you needed to go to the doctor; do you
recall that?

A: Not really, but I went to the doctors and stuff, yes.

(*Id.* at 12.)  The Court does not find Plaintiff's own assertions to be demeaning to him, and he
remembered telling Howard that he took more than the prescribed amount of pain medications
although he did "not really" remember their conversation about it.  Therefore, Plaintiff's attempt
to dispute this fact is unsupported by the record, and the Court will treat this fact as undisputed.

On January 12, 2009, Plaintiff visited Dr. LaVerne Lovell ("Dr. Lovell") about his back
pain.  (Pl.'s Resp. to Def.'s Statement of Facts, D.E. # 20-1, at 2.)  Dr. Lovell recommended back
surgery, scheduled it for March 18, 2009, and told Plaintiff that he preferred to keep his patients
out of work for one year following back surgery.  (*Id.*)  After his back surgery, Plaintiff applied
for and received short term disability leave, which ran for a maximum of six months.  (*Id.*)
Accordingly, this leave ran from March 18, 2009 to September 17, 2009.  (*Id.*)  In the months
after his surgery, Plaintiff continued to see Dr. Lovell, who retained Plaintiff on short term
disability leave without discussing a definite return-to-work date.  (*Id.* at 4.)

After Plaintiff's August 17, 2009 visit with Dr. Lovell, Dr. Lovell placed a note in his
chart about the possibility of Plaintiff's return to work in approximately one month: "We will
request therapy two days a week for four weeks.  I will see the patient back in a month.
Hopefully at that time, we can release him to a work status."  (*Id.*)  However, Dr. Lovell did not
discuss Plaintiff's potential return to work with him.  (*Id.*)  Plaintiff's August 17, 2009 chart
annotation reflected that Plaintiff was "Off Work" with his next appointment scheduled for

September 14, 2009.  (*Id.*)  Accordingly, one month before his short term disability leave

expired, Plaintiff did not know if or when he would be released to return to work.  (*Id.* at 5.)

Due to this uncertainty, Plaintiff applied for long term disability benefits, and if Plaintiff

had been qualified to receive them, they would have started upon the expiration of his short term

disability benefits.  (*Id.*)  On August 24, 2009, Aetna sent Plaintiff a letter containing information

necessary to process his long term benefits claim.  (*Id.*)  The letter said, "From the date you first

become disabled and until Monthly Benefits are payable for [twelve] months, you will be deemed

to be disabled on any day if: you are not able to perform the material duties of your own

occupation solely because of disease or injury and your work earnings are 80% or less of your

adjusted pre-disability earnings."  (*Id.*)

It is undisputed that on or about September 15, 2009, Plaintiff submitted the necessary

forms to apply for long term disability benefits.  (*Id.*)  Plaintiff twice acknowledged on the forms

that he knew that making misrepresentations or otherwise defrauding Aetna in applying for long

term disability benefits is a crime.  (*Id.*)  Thus, Defendant submits that Plaintiff "was not

anticipating returning to work at the time he filled out and submitted the application for [long

term disability] benefits, as he must have had a good faith belief that he was 'not able to perform

the material duties of [his] own occupation solely because of disease or injury.'" (*Id.* at 5-6.)

Plaintiff disputes this fact by citing to the following portion of his deposition:

> Q: Well, we'll see what we can figure out about that.  As of the 15th of September
> when you were sending those documents over to Aetna saying you were seeking
> long-term disability benefits, at that point you didn't have any plans for return to
> work; is that correct?
>
> A: No, I'm trying to remember when I filled these out.  When exactly I mailed
> them in.  I filled them out, but I don't think I mailed them right away.  Something

else was going on. I can't quite remember what was going on. My father-in-law was very sick and everything at the same time too.

Q: Whenever you mailed them in you would agree with me that you were mailing them in and representing to the insurance company you couldn't work and that you were entitled to get long-term disability. Right?

A: Right. I was looking for —

Q: Okay.

A: Because at the time my doctor was still pressuring. He didn't want me going back to work.

Q: Sure. So at that time you mailed them in. If we can establish that we know that as of that date you didn't have any thought of returning to work at that point. You were wanting long-term disability because that's what that's for. Correct?

A: Correct.

(Dep. of Pl., D.E. # 20-3, at 11-13.) Plaintiff's deposition testimony is inconsistent: although he first stated that he did not remember when he filled out the forms, and he appeared to request disability because his doctor did not want him to return to work, he ultimately stated that he mailed the long term disability forms because he did not "have any thought of returning to work."

Defendant submits that Plaintiff told Howard that he applied for long term disability benefits "at some point before the expiration of his [short term disability] leave on September 18, 2009." (Def's Statement of Facts, D.E. # 19-2, at 4.) In support of this fact, Defendant cites to Howard's deposition, which indicates that Plaintiff told Howard that Aetna had turned his case over to long-term disability before his termination. (Dep. of Howard, D.E. # 19-4, at 4.) Defendant also cites Plaintiff's deposition in support of its assertion, and Plaintiff cites the same pages of his deposition to dispute this fact. Plaintiff stated as follows:

Q: Had you told Ms. Howard you were applying for long-term disability benefits?

A: I can't remember if I had or not.

Q: If it's her recollection that you told her that would you have any reason to disagree with that?

A: I somewhat remember, but I talked to different people so I can't really say. I imagine I may have talked to her.

Q: Did you ask her for any guidance or instruction about how to apply for long-term disability benefits?

A: I believe I did now that you're bringing that up, but it would have been just about the same time this all got shipped off and stuff.

Q: Right. You had started that process in August getting the forms from them and you were in the process of filling them out. Somewhere in that time when you had seen her you maybe talked to her about it.

A: I think as far as being employed I had picked up my check or something like that I stopped in that.

(Dep. of Pl., D.E. # 19-3, at 48-49.) Plaintiff's dispute relates to when he specifically spoke with Howard about the long term disability benefits. (Pl.'s Resp. to Def.'s Facts, D.E. # 20-1, at 6.) However, he states that he does recall speaking with her about guidance or instruction for how to apply for long term disability benefits. (*Id.*)

Aetna administered Plaintiff's disability leave and handled all communication with Plaintiff and his doctors concerning his medical condition and leave status. (*Id.* at 2-3.) Defendant states that it did not receive any documentation from Plaintiff or his physicians regarding his medical condition. (*Id.* at 3.) Instead, it received "only a status update from Aetna providing the date [Plaintiff's] leave started, the date through which the leave was approved, and the current leave status." (*Id.*) This status update did not include notes sent by the doctors to Aetna or information about ongoing medical care. (Dep. of Howard, D.E. # 19-4, at 20-21.)

Plaintiff disputes these facts because Defendant designated Aetna as its third-party short term disability administrator and Defendant received information from Aetna, thereby rendering Defendant the principal to Aetna's agent.  (Pl.'s Resp. to Def.'s Statement of Facts, D.E. # 20-1, at 3.)

Plaintiff points to several documents from Aetna related to his short and long term disability claims; the earliest documentation in the packet of documents is an August 17, 2009, note from Dr. Lovell regarding Plaintiff's medical status.  (Aetna Documents, D.E. # 20-4, at 7.)  Records of phone calls or other communications—the documents themselves do not indicate which—reflect that Aetna called Howard on March 2, 2010.  (*Id.* at 10.)  But that communication occurred after Plaintiff's termination, and the other communication records do not reflect communication with Aetna or Defendant.  (*Id.*)  However, Plaintiff also stated in his deposition that he took a document from Dr. Lovell to Howard on September 21, 2009, and stated that "there should have been another and there was a total of three if I'm not mistaken than I took up there."  (Dep. of Pl., D.E. # 20-3, at 8.)  Plaintiff asserts that the September 21, 2009 document was the latest of the three; accordingly, Plaintiff asserts that Defendant received information from him regarding his medical condition.  (Pl.'s Resp. to Def.'s Statement of Facts, D.E. # 20-1, at 3.)  Neither party provided Plaintiff's personnel file, so the Court does not know whether these documents made their way into Defendant's official records.  Additionally, Plaintiff did not provide a copy of the three documents.

Under Defendant's Maximum Medical Leave of Absence Termination Policy ("the Policy"), employees who cannot perform the essential functions of their positions or another position offered by Defendant with or without reasonable accommodation after six months of

leave within a twelve-month period face automatic termination. (*Id.*) The Policy provides that "[a]ny employee subject to termination under this [P]olicy may apply for an extension of his [or] her leave. Requests for extensions will not be considered unless Defendant receives them "before termination would otherwise take effect" and they include medical documentation demonstrating that the employee would be able to return to work, with or without reasonable accommodations, "on a date certain within a reasonable time after termination would otherwise take effect." (Policy, D.E. # 19-3, at 73.) Notably, "[a]ny employee whose employment has been terminated according to [the P]olicy may reapply for employment with [Defendant] as a new employee at such time as he or she is able to work." (*Id.*)

Defendant submits that Howard explained the Policy to Plaintiff while he was out on leave and that Plaintiff understood the Policy. (Pl.'s Resp. to Def.'s Statement of Facts, D.E. # 20-1, at 4.) Plaintiff disputes this fact by citing to Howard's deposition testimony. Howard testified as follows:

Q: Was that town hall meeting a discussion of the insurance program in general or specifically and solely that new policy?

A: Changes of insurance in general w[ere] included.

Q: Okay. Were employees required to be at that town hall meeting?

A: Yes, they were.

Q: Was roll kept?

A: I'm not sure at that time because we just brought everybody in that morning at the beginning of the shift, so I'm not sure they did a sign-in sheet that morning or not.

Q: Was the policy distributed at that town hall meeting?

A: No, it wasn't.

Q: Was it ever distributed?

A: It was — it's discussed with the employee at the time they go off on — one on one as they go off on leave. . . . They was informed [sic] that due to the changes in insurance — during that conversation I personally explained the difference in part of the insurance, that it was no longer a one-year medical leave of absence and explained the long-term disability that was going into effect. There was no longer a one-year medical leave of absence, that it was six months. Then at the end of six months, then they would be eligible for the long-term disability.

. . . .

Q: Did you have a meeting with [Plaintiff] prior to his going on medical leave to explain th[e Policy]?

A: When Steve went — he would sign his paperwork — he would sign his paperwork. We informed him — I mean, we informed all our employees that when you go out on medical leave of absence, . . . you're off for 26 — if you're off beyond 26 weeks, which is your short-term disability. And if you exhaust your 26 weeks, then it will go into long-term disability.

Q: Okay. And my question is did you, in fact, have a meeting with [Plaintiff] to discuss [the Policy]?

A: Just to have a meeting to discuss this specific [Policy], and that's the only thing we discussed? No, I did not.

Q: All right. Did you have a meeting with [Plaintiff] prior to him going out on medical leave—

A: No.

Q: —at all?

A: Yes.

Q: Okay. At that meeting did you discuss [the Policy]?

A: Wait a minute. You're confusing me. You said did I have any meeting at all with [Plaintiff]?

Q: Did you have a meeting with [Plaintiff] prior to him going out on his six-month medical leave?

A: Right, I did.

Q: When was that?

A: That was the day that — after he had come back — after he had come back to work off his first leave, he returned back to work. He worked for awhile, and then his supervisor brought him up to the office. I don't have dates right in front of me, okay. He was telling — he was telling his supervisor that he was having some problems with his pain. That's when he informed me about the medication he was taking. I suggested to him that — I asked him had he contacted his doctor, okay. He said, "Try to get an appointment." I, in turn, turned around and called — asked if he wanted me to try to help him get an employment [sic]. He was standing in the office. I called the office and got his appointment, okay.

   After he got his appointment, he was taken — he was off for awhile, okay. Then he got an appointment to see Dr. Magee, and then they decided — I don't know when he went to see Dr. Lovell. I can't say. But when they came back to tell us that he was going to do his surgery and that he would be off on leave, then we covered the short-term disability and the long-term disability.

Q: When you say "we," who is we?

A: The paperwork — the paperwork that we give him to contact Aetna, you know, you do this for — you call Aetna. You get this insurance. You call this number. They have to contact your doctor. They'll tell you what information you need to contact your doctor for short term disability.

Q: You said they came back to tell you he was going to go on his leave. Who is "they"?

A: I mean he. Sorry.

. . . .

Q: So [Plaintiff] came to you and told you that?

A: [Plaintiff] — we discussed — he said that the doctor had scheduled his surgery as far as my recollection.

Q: Did he tell you how long — did he tell you when that surgery was going to be?

A: I can't recall.

Q: Okay. Did he tell you how long he would be out?

A: No, he did not.

Q: Did you hand him [the Policy]?

A: No, I did not.

Q: Okay. Do you know if he's ever had a copy of that?

A: I cannot recall.

Q: Okay. Did you tell him at that time that there were — that he had a maximum leave of six months?

A: Yes.

Q: Did you tell him that there were any exceptions to that?

A: Not that I recall.

Q: Did you tell him how he could get an extension?

A: He didn't ask, so no, I wouldn't have if he had not asked. I do not recall that I did.

Q: Have you ever told any employee how to get an extension on that policy?

A: After the suit came about, we looked at how could we better explain to our employees, so we started to send[] letters so that we would have better verification of what was discussed with our employees.

(Dep. of Howard, D.E. # 19-4, at 8-9, 12-16.) Moreover, Plaintiff stated that "it was being notified to me [sic] that there was a six month period of time." (Dep. of Pl., D.E. # 19-3, at 45.) From this testimony, the Court discerns that Howard told Plaintiff about the six-month short term disability time limit, but she did not explain how Plaintiff could get a leave extension. Furthermore, at the town hall meeting, Howard's remarks could be interpreted to be contrary to

the Policy: stating that "if you exhaust your 26 weeks, then it will go to into long term disability" does not square with the Policy's warning that inability to perform the essential functions of an employee's position with or without reasonable accommodation for a six-month period will result in automatic termination. Additionally, from Plaintiff's statement, it appears that he knew about the time limit, but he did not indicate whether he knew that it could be extended or that he understood the Policy or even had a copy of it. Neither Plaintiff nor Howard indicated whether he attended the town hall meeting about the six-month time limit.

On September 18, 2009, Howard terminated Plaintiff's employment pursuant to the Policy because he had exhausted his six months of medical leave. (Pl.'s Resp. to Def.'s Facts, D.E. # 20-1, at 6.) Howard completed his Hourly Associate Termination Worksheet on September 18, and she testified that his "termination date would have been effective on [September 18]." (Dep. of Howard, D.E. # 19-4, at 18-19.) Defendant submits that Plaintiff never asked Howard or any other of its employees for an extension of his medical leave and never asked to return to work in a different position. (Pl.'s Resp. to Def.'s Facts, D.E. # 20-1, at 6.) While Plaintiff does not dispute "that Howard terminated [him] on September 18, 2009, because he had exhausted his six months of leave" and that he never asked for an extension of his medical leave, he adds that Howard did not explain to him how to get an extension of the six-month leave policy. (*Id.* at 6-7.) Plaintiff also points out that Aetna, Defendant's agent and third-party disability leave administrator, possessed evidence in August of 2009 from Plaintiff's physician of his likely return to work date. (*Id.* at 7.) Aetna produced Dr. Lovell's notes from August 2009, stating that at the next doctor's appointment—scheduled for September 14, 2009, and later rescheduled for September 21, 2009—"I will see [Plaintiff] back in a month. Hopefully

at that time, we can release him to a work status." (*Id.*) Additionally, Defendant did not offer Plaintiff a different position, but Plaintiff would have taken it if Defendant had done so. (*Id.*)

Plaintiff next saw Dr. Lovell on September 21, 2009. (*Id.*) During that visit, Dr. Lovell strongly advised Plaintiff against returning to work, stating that he preferred to keep patients out for a year following back surgery. (*Id.*) However, Plaintiff pressured Dr. Lovell for a return-to-work status, so Dr. Lovell released Plaintiff to work with restrictions, including "sit or stand as needed, a ten-pound lifting restriction, and no repetitive bending or stooping." (*Id.*) Dr. Lovell's chart notes reflect that "these restrictions are 'not in keeping with the job of mold setter that [Plaintiff] currently has.'" (*Id.*) Plaintiff does not dispute these facts, but he requests the Court to draw the inference that Plaintiff was afraid of being fired and was willing to try to get back to work. (*Id.* at 8.)

After Plaintiff's September 21 appointment, Plaintiff went to Defendant's plant and gave his return-to-work release to Howard. (*Id.*) Howard gave the release back to Plaintiff and told him that he had been terminated three days earlier, on September 18, upon the expiration of his six months of leave. (*Id.*) Plaintiff took the release and left the plant without talking to anyone else about his termination. (*Id.*)

While Plaintiff was on medical leave, Defendant conducted plant-wide layoffs at its Ripley, Tennessee facility according to seniority by job classification. (*Id.*) Defendant submits that "[p]ursuant to [its P]olicy, employees with no definite return-to-work date were discharged for lack of work rather than laid off." (*Id.*) Plaintiff disputes this fact by citing to his previous agency argument regarding the existence and Aetna's knowledge of his return-to-work date. (*Id.* at 2-3, 6-8.) Defendant submits that due to Plaintiff's relative lack of seniority, no open position

for him existed on September 21, 2009, and Plaintiff would have been discharged due to lack of work had he not already been terminated three days earlier. (*Id.* at 8.) Plaintiff disputes this fact by citing to the same portions of Howard's deposition testimony as Defendant. In her deposition, Howard states as follows:

Q: Do you know—sitting here today, do you know whether or not there were positions open and available for Mr. Cash at the end of the six-month period?

. . . .

A: We had layoffs. We had people that was [sic] terminated with several years seniority over [Plaintiff]. So based on those circumstances had he come back to work and returned at that time, no, he would not have had a position. There would not have been anything available. Let me say as far as full-time status.

Q: Okay. So is it your testimony that had [Plaintiff] never taken medical leave, he would have been laid off anyway?

A: Correct.

Q: And tell me every fact that you base that assertion on.

A: We do plant-wide seniority. Let me rephrase that. We do plant-wide seniority, and there are certain job classifications, okay. If he had—when he returned from his first visit and there were restrictions that he could not perform, then if he had gone back to the lower job classification, then there were people there with ten to fifteen year[s] of seniority over him that were laid off.
   If we have a—under [the] policy of the new owner, if we do not have a definite callback date for associates, they are terminated for lack of work rather than just laid off. There were some that was [sic] laid off—and this was during the time that General Motors was going into their bankruptcy—that we was [sic] anticipating that we would get them called back. We was [sic] going week from week. And there was some that did manage to come back without losing their seniority. But then at the time after we got those called back, we did not and we could not say that we had a definite callback that the rest of the employees would be called back. So at that time I terminated those that we did not have a definite callback date for.

Q: Now was that—during the time that you terminated those employees, was that during [Plaintiff's] six-month leave of absence . . . ?

14

A: Yes. . . .

(Dep. of Howard, D.E. # 19-4, at 10-12.)  Plaintiff interprets this testimony to state that no full-time positions were available based on the layoffs that took place while Plaintiff was out on medical leave.  (Pl.'s Resp. to Def.'s Facts, D.E. # 20-1, at 9.)  Thus, according to Howard, Plaintiff would have been laid off due to lack of work, not discharged as Defendant claims, had he not already been terminated three days earlier.  (*Id.*)  Plaintiff also points out that Howard further stated that some individuals did manage to come back without losing their seniority.  (*Id.*)

Plaintiff submitted additional statements of undisputed fact to which Defendant has responded.  Plaintiff asserts that Defendant never informed him how to get an extension or that an extension was even possible.  (Def.'s Resp. to Pl.'s Facts, D.E. # 27-1, at 1.)  Defendant disputes this fact by pointing out that Plaintiff reviewed the Policy, and the Policy states on its face that an extension of medical leave is possible and describes how to obtain such an extension. (*Id.*)  Defendant now communicates with employees at the end of their leave and provides them with information in writing regarding their leave and how to get an extension.  (*Id.*)  Defendant does not dispute this current communication practice, but it asserts that that this fact is inadmissible as a subsequent remedial measure under Federal Rule of Evidence 407.  (*Id.*)  The Court agrees, and it will **SUSTAIN** Defendant's objection and disregard this assertion.

The parties do not dispute that Plaintiff's termination had not been processed in the system on September 21, 2009, and it did not process until September 23.  (*Id.* at 1-2.)  Plaintiff's separation notice did not issue until September 30, 2009.  (*Id.* at 2.)  Plaintiff asserts that Defendant's third-part disability administrator, Aetna, possessed evidence in August of 2009 from Plaintiff's physician stating that he would be released to work at his next office visit, which

was originally scheduled for September 14, 2009, and subsequently occurred on September 21, 2009.  (*Id.*)  Defendant disputes this fact for two reasons: first, Aetna's documents indicate that Dr. Lovell hoped that Plaintiff would be released to work, not that Plaintiff definitively would be released to work.  (*Id.*)  Second, Defendant disputes the inference that it had any actual, constructive, or imputed knowledge of those records or any other medical information in Aetna's possession.

Plaintiff submits that Howard called Aetna and received information about Plaintiff's medical leave.  (*Id.*)  Defendant does not dispute that Howard called Aetna on March 2, 2010, after learning of Plaintiff's EEOC charge, to determine whether Plaintiff's long-term disability claim had been granted.  (*Id.*)  Aetna had denied the claim.  (*Id.*)  Defendant again disputes the inference that it had any actual, constructive, or imputed knowledge of those records or any other medical information in Aetna's possession.  (*Id.*)

Since Plaintiff's termination in September of 2009, Defendant has hired many new employees in both full-time and part-time positions.  (*Id.*)  However, Defendant has not offered Plaintiff an alternate position or part-time work since his termination.  (*Id.* at 3.)  Defendant questions whether these facts are material, as Plaintiff never sought reinstatement after he was terminated and instead pursued long-term disability benefits.  (*Id.*)

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that the

> court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[2]

---

[2]      Fed. R. Civ. P. 56(a).

In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[3]  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but instead must present some "specific facts showing that there is a genuine issue for trial."[4]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[5]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[6]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[7]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[8]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."[9]

---

[3]    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[4]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[5]    *Matsushita*, 475 U.S. at 586.

[6]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[7]    *Id*. at 251-52.

[8]    *Celotex*, 477 U.S. at 322.

[9]    *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

## ANALYSIS

Title I of the Americans with Disabilities Act ("ADA") provides that a covered employer

"shall [not] discriminate against a qualified individual on the basis of disability in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment."[10]  In

ADA cases presenting circumstantial evidence of discrimination, courts apply an evidentiary

framework similar to the *McDonnell Douglas* burden-shifting analysis used in Title VII cases.[11]

Because neither party has pointed the Court to direct evidence of discrimination, the Court will

apply this burden-shifting analysis.  To make out a prima facie case of employment

discrimination through indirect evidence under Title I, a plaintiff must show that "(1) he or she is

disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3)

suffered an adverse employment action; (4) the employer knew or had reason to know of the

plaintiff's disability; and (5) the position remained open while the employer sought other

applicants or the disabled individual was replaced."[12]  Once a plaintiff makes out a prima facie

---

[10]      42 U.S.C. § 12112(a).  Plaintiff's First Amended Complaint does not identify under which Title of the ADA he has brought suit: Plaintiff cites to the ADA as "42 U.S.C. § 12101 *et seq*."  (Am. Compl., D.E. # 12, at 1.)  However, based on the facts in the First Amended Complaint, the Court finds that Plaintiff has brought suit under Title I because he was discharged when his short-term disability leave ended.

[11]      *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc) (adopting a but-for causation standard for ADA cases and overruling the Sixth Circuit's previous sole-causation standard).

[12]      *Whitfield v. Tennessee*, 639 F.3d 253, 258-59 (6th Cir. 2011) (selecting the five-element *Monette* test as the proper prima facie case test and declining to adopt the three-element *Mahon* test).

case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual.[13]

Because Plaintiff suffered a back injury requiring surgery and a long leave of absence from his employment, the Court finds that he was disabled, thereby satisfying the first element of his prima facie case.  Defendant also knew of his disability as Plaintiff was on short-term disability and discussed his status with Howard.  Additionally, Plaintiff suffered an adverse employment action when Defendant terminated him.  In any case, Defendant does not challenge these three elements of Plaintiff's prima facie case.  However, Defendant asserts that Plaintiff cannot make out the second and fifth elements of his prima facie case.  Defendant limits its arguments to Plaintiff's prima facie case and does not address its legitimate non-discriminatory reason for firing Plaintiff or pretext.  As such, the Court will confine its analysis to the arguments submitted by the parties.

Initially, Defendant characterizes Plaintiff's claim as a "failure to accommodate" claim.[14] But the Court is not certain that Plaintiff has set forth a failure to accommodate claim; after all, he was terminated from his position, rendering his claim one for discharge other than a mere failure to accommodate his disability.[15]

---

[13]     *Id.* at 259.

[14]     (Def.'s Mot., D.E. # 19-1, at 7.)

[15]     *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868, 868 n.2 (6th Cir. 2007) (noting that "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination" but recognizing that "this, of course, is not necessarily true of claims premised upon an adverse employment decision such as a failure to hire, failure to promote, or discharge").

## Whether Plaintiff's Position Remained Open and Whether He Was Replaced

A reduction in force ("RIF") occurs when business considerations cause an employer to eliminate one or more positions within the company.[16]  An employee is not terminated as part of a RIF when he or she is replaced after his or her discharge, and "replacement" is defined as hiring or reassigning another employee to perform the terminated employee's duties.[17]  In a RIF case, plaintiffs face a heightened prima facie case burden.[18]  Thus, a terminated employee must present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."[19]  Usually, a plaintiff can satisfy this heightened burden by demonstrating that a "comparable, non-protected person was treated better."[20]

In its Motion, Defendant argues that even if it had not applied the Policy and terminated Plaintiff on September 18, 2009, it would have terminated Plaintiff anyway on September 21, 2009 when he attempted to return to work.[21]  Defendant relies on its plant-wide layoffs and argues that those employees, like Plaintiff, "with no definite return-to-work date were discharged

---

[16]     *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).

[17]     *Id.*

[18]     *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir. 1991).

[19]     *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).

[20]     *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998).

[21]     (Def.'s Mot., D.E. # 19-1, at 10.)

for lack of work rather than put on temporary layoff."[22]  Thus, Plaintiff cannot establish that "there was no longer an open position for [him]."[23]

In response, Plaintiff argues that Defendant cannot rely on this hypothetical decision to excuse his termination.[24]  Plaintiff casts the cause of his termination as "Defendant's refusal to extend Plaintiff's leave by three days," thereby denying him an accommodation.[25]  Plaintiff submits that Howard's deposition testimony is "highly confusing and unhelpful," and he argues that he "has offered legally sufficient evidence that he would have maintained gainful employment—either full time or part time or, at least, subject to being called back—if Defendant had just simply extended his leave by three days."[26]  Thus, Plaintiff argues that Defendant cannot rely on a *Mt. Healthy* defense because it has not proved that Plaintiff would not have been entitled to any relief even in the absence of discrimination.[27]

In reply, Defendant argues that it did not make a *Mt. Healthy* argument; instead, it states that it highlighted its layoffs and discharges to demonstrate that Plaintiff could not meet his burden to show that he could perform the functions of a mold setter or that there were other available jobs he could have performed with restrictions.[28]  Defendant again points out that

---

[22]    (*Id.*)

[23]    (*Id.* at 11.)

[24]    (Pl.'s Resp., D.E. # 20, at 8.)

[25]    (*Id.*)

[26]    (*Id.* at 9.)

[27]    (*Id.*)

[28]    (Def.'s Reply, D.E. # 27, at 10.)

Plaintiff never applied for another position with Defendant after his termination processed through the system, instead pursuing long-term disability benefits and demonstrating that he did not actually want to return to work.[29]

At the outset, the Court must address Plaintiff's reliance on *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977),[30] which identifies a "same decision" employer defense applicable only in cases involving mixed-motive terminations. The Sixth Circuit recently adopted a but-for causation standard for ADA cases and retired its sole causation standard.[31] Accordingly, any mixed-motive defense Defendant attempts to assert would not apply, and in any case, Defendant asserts that it is not alleging a mixed-motive defense. Therefore, the Court is not persuaded by this argument.

Additionally, the Court finds that a RIF did not take place in this case. Although Defendant disputed the materiality of its hiring of new employees based on Plaintiff's failure to seek reinstatement, a prima facie case of disability discrimination does not require Plaintiff to have reapplied for his job. Instead, the fifth element questions whether Defendant hired new employees. Although the parties do not dispute that "Defendant has hired many new employees" since September of 2009, neither party states when Defendant hired these employees. However, the Court will view this information in the light most favorable to Plaintiff, and it will assume that Defendant hired employees within a time period sufficient to render this hiring relevant and

---

[29]     (*Id.* at 10-11.)

[30]     (Pl.'s Resp., D.E. # 20, at 8-9.)

[31]     *See Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

material to Plaintiff's termination. In the absence of information from both parties, the Court

will also assume that Defendant hired other Mold Setters or comparable positions for which

Plaintiff was eligible. Accordingly, the Court finds that a RIF did not occur; therefore, Plaintiff

is not required to meet the heightened requirements for this element.

The Court finds that Plaintiff has satisfied the fifth element of his prima facie case.

Because Defendant hired other employees, the Court finds that Plaintiff was replaced based on

the assumptions—all taken in the light most favorable to Plaintiff—discussed above.

Accordingly, Plaintiff has satisfied the fifth element of his prima facie case, and the Court turns

to his second element.

## Plaintiff's Qualifications for His Position With or Without Reasonable Accommodation

Failing to make a reasonable accommodation falls within the ADA's definition of

"discrimination."[32] Reasonable accommodations include "making existing facilities used by

employees readily accessible to and usable by individuals with disabilities and job restructuring,

part-time or modified work schedules, reassignment to a vacant position, acquisition or

modification of equipment or devices, appropriate adjustment or modifications of examinations,

training materials, or policies, the provision of qualified readers or interpreters, and other similar

accommodations for individuals with disabilities."[33] Plaintiffs "must establish that a reasonable

accommodation is possible, and [they] bear[] a traditional burden of proof that [they are]

qualified for the position with such reasonable accommodation."[34] Thus, plaintiffs must merely

---

[32]     42 U.S.C. §§ 12112(a), (b)(5)(A).

[33]     *Id.* § 12111(9).

[34]     *Cehrs v. N.E. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 781 (6th Cir. 1998).

"suggest the existence of a plausible accommodation, the costs of which, facially, do not exceed its benefits."[35]  The EEOC has placed the initial burden of requesting an accommodation on the employee; if the employee fails to do so, he or she cannot satisfy this burden.[36]

If an employee establishes that he or she requested an accommodation and that a reasonable accommodation is possible, the burden shifts to the employer to prove that the accommodation is unreasonable and imposes an "undue hardship" on the employer.[37]  To prove undue hardship, the employer must show "both that the hardship caused by the proposed accommodation would be undue in light of [several] factors and that the proposed accommodation is unreasonable and need not be made."[38]  The ADA requires courts to consider the following factors:

> (i) the nature and cost of the accommodation needed under this chapter; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity.[39]

---

[35]     *Id.*

[36]     *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046-47 (6th Cir. 1998).

[37]     *Cehrs*, 155 F.3d at 781.

[38]     *Id.* at 782 (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

[39]     42 U.S.C. § 12111(10)(B).

The employee bears the ultimate burden to prove that he or she is qualified for the position.[40]

In *Cehrs*, the plaintiff suffered from psoriasis, and she requested temporary leave as an accommodation for a psoriasis flare-up.[41] Because her employer routinely granted medical leave to employees and the plaintiff had never requested an extended leave during her tenure before her psoriasis-related request, the court found that "a genuine issue of fact exist[ed] as to whether granting further medical leave to [the plaintiff] would have unduly burdened [the employer], or instead would have constituted a reasonable accommodation to [the plaintiff] under the ADA."[42] However, in *Hammon*, when the plaintiff "offered no proof that he filed a request under the ADA while he was [working for his employer,] . . . he failed to prove that he requested an accommodation." This failure led the court to conclude that the plaintiff did not offer proof on this element, thus failing to establish his prima facie case.[43] Moreover, when a plaintiff never requested to return to work during her leave of absence, requested any kind of accommodation from her employer, or contacted her employer after she received notice of her termination to request reconsideration in light of her misunderstanding of the leave policy, the plaintiff did not adequately request an accommodation, and her prima facie case failed.[44]

In its Motion, Defendant argues that Plaintiff did not request a reasonable accommodation before his short term disability leave expired on September 18, 2009 and that, accordingly, he

---

[40] *Cehrs*, 155 F.3d at 782.

[41] *Id.*

[42] *Id.* at 783.

[43] *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999).

[44] *Gantt*, 143 F.3d at 1047.

was not contemplating returning to work at that time.[45]  Defendant also points to Plaintiff's

August and September 2009 application for long term disability benefits, which Plaintiff

communicated to Howard, and argues that he must have fairly believed that he would not be able

to perform the material duties of his own occupation solely because of his disability.[46]  Defendant

contends that Plaintiff's untimely accommodation request on September 21, 2009—three days

after his short term disability leave expired—has no effect.[47]  Because Plaintiff had already been

fired when he notified Defendant of his return-to-work status, Defendant argues that he was a

former employee no longer protected by the ADA.[48]  Additionally, Defendant avers that the

Policy was not an "inflexible, blanket policy" in violation of the ADA; instead, it provides

employees with the opportunity to request additional leave.[49]

In response, Plaintiff argues that extensions of disability leave can be reasonable

accommodations under the ADA, and he points out that Defendant did not argue that granting

Plaintiff an extension would have been an undue hardship.[50]  Plaintiff summarizes Defendant's

arguments as follows: "Defendant claims that Plaintiff's request for three additional days was

*untimely* (too late) because it was made on day 183 (September 21), not day 180 (September 18).

In this sense, Defendant is arguing that Plaintiff breached the highly fact-specific interactive

---

[45]     (Def.'s Mot., D.E. # 19-1, at 8.)

[46]     (*Id.*)

[47]     (*Id.*)

[48]     (*Id.* at 9.)

[49]     (*Id.* at 10.)

[50]     (Pl.'s Resp., D.E. # 20, at 1-2.)

process by offering an untimely request for accommodation."[51]  Plaintiff directs the Court to

*Cehrs*, which he asserts is controlling authority adverse to Defendant's position which Defendant

failed to point out to the Court, and argues that "under the ADA, an employer may not claim that

an employee taking a known leave of absence for a disability is 'too late' by requesting an

extension of that leave three days after termination processing has begun."[52]

Additionally, Plaintiff submits that Aetna is Defendant's agent and, because Aetna

received information about Plaintiff's return to work, that knowledge was imputed to

Defendant.[53]  Thus, because Defendant could have regularly communicated with Aetna and did

so regarding Plaintiff's medical leave, an inference arises that Defendant "knew, or with

reasonable diligence, should have known of" Plaintiff's anticipated return-to-work date.[54]

Furthermore, Plaintiff states that Defendant's own failure to communicate with him resulted in

his termination; if Defendant had engaged in the interactive process regarding his disability, it

would not have fired him upon the expiration of his short term disability leave.[55]

In reply, Defendant addresses and distinguishes *Cehrs*.[56]  Defendant argues that this case

more closely parallels *Hammon* because the *Hammon* plaintiff did not request an accommodation

---

[51]        (*Id.*)

[52]        (*Id.* at 3-4.)

[53]        (*Id.* at 5.)

[54]        (*Id.* at 6.)

[55]        (*Id.* at 6-7.)

[56]        (Def.'s Reply, D.E. # 27, at 2-4.)

just as Plaintiff failed to request an accommodation here.[57] Defendant also avers that employers commonly use third parties to administer leave programs, and it did not set up unnecessary roadblocks for Plaintiff to return to work.[58] Moreover, Defendant asserts that it had no knowledge about Plaintiff's potential return-to-work status and that Plaintiff's August 2009 doctor's note is ambiguous at best.[59] Finally, Defendant argues that it did not cause Plaintiff's termination by failing to communicate with him; instead, it contends that Plaintiff actively pursued long-term disability benefits, knew about the Policy's six-month limit, and never requested to extend his short-term disability leave.[60]

Plaintiff also filed supplemental authority and drew the Court's attention to an ADA case from the Middle District of Tennessee.[61] In *Coffman*, the court held that, based on the plaintiff's request for a reasonable accommodation in the form of additional unpaid leave and the defendant's deposition testimony that it would not have suffered any hardship by granting the plaintiff an extension of leave, the plaintiff had presented evidence that she was a qualified individual with a reasonable accommodation.[62] In response, Defendant distinguishes *Coffman* by pointing out that the plaintiff provided her employer with a firm return-to-work date and

---

[57]     (*Id.* at 5-6.)

[58]     (*Id.* at 6.)

[59]     (*Id.* at 7-8.)

[60]     (*Id.* at 8.)

[61]     (Pl.'s Supplemental Authority, D.E. # 30, at 1 (citing *Coffman v. Robert J. Young Co., Inc.*, No. 3:10-cv-01052, 2012 WL 1717327 (M.D. Tenn. May 14, 2012).)

[62]     *Coffman*, 2012 WL 1717327, at *10.

requested an extension of her leave before her employer terminated her without speaking to her or otherwise engaging in the interactive process.[63]

The Court finds that Plaintiff has not made out the second element of his prima facie case. Plaintiff misplaces his focus on the fact that his termination did not process through the system until September 23, 2009, and that his termination notification did not issue until September 30, 2009. Howard testified that Plaintiff's termination would have been effective on September 18, 2009, and Plaintiff does not dispute this statement. Therefore, the fact that the system hadn't processed his termination when he went to Howard with his return-to-work status is irrelevant: Plaintiff's effective date of termination was September 18. Although Defendant may have been required to reconsider its decision due to the three-day difference between Plaintiff's termination and his acquisition of a return-to-work status, Plaintiff did not request reconsideration and did not reapply for his position, even though the Policy expressly permits him to do so. Moreover, the Court cannot interpret his return-to-work status as a request for an extension of his short-term disability. Plaintiff was released to work with restrictions on September 21; therefore, he was ready to return to work. He was also pursuing long term disability benefits. Neither of these actions implicates a request for an extension of his short-term disability leave.

*Cehrs* does not help Plaintiff. The *Cehrs* plaintiff requested temporary leave as an accommodation while she was still employed by the defendant. Here, Plaintiff presented Defendant with his return-to-work status—albeit with limitations—which Defendant did not consider because Plaintiff had been terminated effective September 18, 2009. The record does

---

[63]     (Def.'s Resp., D.E. # 31, at 1.)

29

not reflect that Plaintiff requested an extension of his short term disability leave prior to his termination, and although Howard never explained how to request an extension, Plaintiff had a copy of the Policy, which notified him of the need to request an extension. Similarly, Plaintiff's supplemental authority does not apply: the plaintiff in *Coffman* requested a reasonable accommodation before the employer fired her, but here, Plaintiff did not request an accommodation until after his effective date of termination.

Furthermore, the second paragraph of the Policy does not help Plaintiff: because Plaintiff never requested an extension, the two triggers necessary to require Defendant to consider any extension request would not satisfied. Howard indicated that Plaintiff's termination was effective as of September 18; even if his return-to-work status notification on September 21 could be construed as an extension request, his termination "would otherwise [have] take[n] effect," permitting Defendant not to consider the request.

Plaintiff's reliance on the alleged principal-agent relationship between Defendant and Aetna is also unavailing. The documents Plaintiff submitted along with his Response do not support Plaintiff's argument that Aetna regularly communicated with Defendant about Plaintiff's short term disability leave. The first three documents are communications sent in 2011, nearly two years after Plaintiff's termination.[64] While the Fax Message was sent on August 18, 2009, Gelata Huddleston sent it to Dr. Lovell and "Ms. Grays."[65] Neither party has identified who Gelata Huddleston and Ms. Grays are or for whom they work. Moreover, the Fax Message indicates that Plaintiff would "hopefully" be released to a work status at his September

---

[64]        (Aetna Docs., D.E. # 20-4, at 2-5.)

[65]        (*Id.* at 6-7.)

appointment; his release was uncertain. Thus, this communication does not support Plaintiff's argument that Defendant knew of Plaintiff's anticipated return-to-work date, as no return-to-work date was set.

The final two pages of Aetna documents present a different issue. Aetna interpreted Dr. Lovell's note as "giving 9-18 as his [return-to-work] date."[66] But the Court is not bound by this interpretation, and in any case, the exact words of Dr. Lovell's evaluation prove more accurate than Aetna's interpretation. Moreover, the communication records do not reflect any communication from Aetna to Defendant regarding Plaintiff's return-to-work status. Although "incoming correspondence" occurred on August 20, 2009, the correspondence related to a "long term disability insurance payroll authorization form."[67] Even assuming that this incoming correspondence came from Defendant, it does not indicate that Aetna sent outgoing correspondence to Defendant regarding Plaintiff's return-to-work status. Accordingly, the Court does not find support for Plaintiff's requested inferences that "Defendant could have regularly communicated with Aetna and did so regarding Plaintiff's medical leave" and that Defendant should have known about Plaintiff's anticipated return-to-work date.

Therefore, the Court's holding rests on several key propositions. According to Howard, Defendant effectively terminated Plaintiff as of September 18, 2009. Although the system had not processed his termination when Plaintiff approached Howard with his return-to-work status on September 21, Howard indicated that his termination was effective as of September 18. Even

---

[66]     (*Id.* at 9.)  The documents on page 10 reflect communications purportedly taking place between Defendant and Aetna after Plaintiff's termination.  Therefore, the Court will limit its review to those occurring before Plaintiff's September 18, 2009 termination.

[67]     (*Id.*)

31

if Plaintiff's September 21 return-to-work notification could be construed as a reasonable accommodation request, Plaintiff's termination had become effective three days earlier on September 18. Therefore, Defendant no longer employed him, and it did not need to honor or consider his reasonable request. Even though Defendant could have considered Plaintiff's request, it was not required to do so. This strict application of the Policy's terms, while harsh, follows the language of the Policy, and Defendant has the choice to abide by its own Policy. Moreover, the Policy provides that Plaintiff could have reapplied for his position or any others that became available, or Plaintiff could have requested reconsideration of the termination decision, but he has not indicated that he did so. Accordingly, Plaintiff did not meet his burden to timely request a reasonable accommodation. Because he had been effectively terminated when he requested the reasonable accommodation, his accommodation request was untimely, and Defendant's failure to consider it did not violate the ADA. Thus, Plaintiff cannot make out the second element of his prima facie case, and because he cannot do so, his prima facie case fails. Consequently, Defendant's Motion for Summary Judgment is **GRANTED**.

## CONCLUSION

For the foregoing reasons, Defendant's Motion is **GRANTED**.

**IT IS SO ORDERED.**

> **s/ S. Thomas Anderson**
> S. THOMAS ANDERSON
> UNITED STATES DISTRICT JUDGE
>
> Date: August 24, 2012.